IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**RONALD L. HAYWARD,**

      Movant,

  v.

**WARDEN, GRAFTON
CORRECTIONAL INSTITUTION,**

      Respondent.

Civil No. 2:19–cv–1313
Chief Judge Edmund A. Sargus, Jr.
Magistrate Judge Kimberly A. Jolson

## REPORT AND RECOMMENDATION

Petitioner, a state prisoner, has filed a pro se petition for a writ of habeas corpus under 28 U.S.C. § 2254. (Doc. 1.) This case has been referred to the Undersigned pursuant to 28 U.S.C § 636(b) and Columbus' General Order 14–1 regarding assignments and references to United States Magistrate Judges.

Petitioner has also filed an application for leave to proceed *in forma pauperis*. (Doc. 2.) The Court's electronic docket indicates that Petitioner has, however, paid the $5.00 filing fee. Accordingly, the application to proceed *in forma pauperis* (Doc. 2) is **DENIED** as moot.

Pursuant to Rule 4 of the Rules Governing Section 2254 Cases in the United States District Court ("Rule 4"), the Court must conduct a preliminary review to determine whether "it plainly appears from the petition and any attached exhibits that the petitioner is not entitled to relief in the district court." If it does so appear, the petition must be dismissed. *Id*. Rule 4 allows for the dismissal of petitions which raise legally frivolous claims, as well as petitions that contain factual allegations that are palpably incredible or false. *Carson v. Burke*, 178 F.3d 434, 436–37 (6th Cir. 1999). For the reasons that follow, it plainly appears that Petitioner is not entitled to relief because

his claims are procedurally barred. Moreover, two of his three claims are not cognizable. Accordingly, the Magistrate Judge **RECOMMENDS** that the petition be **DENIED** and that this action be **DISMISSED**.

## I.     FACTS AND PROCEDURAL BACKGROUND

Petitioner challenges his November 4, 2015, conviction in the Court of Common Pleas for Franklin County, Ohio. (Doc. 1.) The state appellate court summarized the relevant procedural history as follows.

> By indictment filed April 24, 2014, plaintiff–appellee, State of Ohio, charged Hayward with one count of possession of marijuana, in violation of R.C. 2925.11, a second–degree felony; and one count of trafficking in marijuana, in violation of R.C. 2925.03, a second–degree felony. The indictment charged Hayward along with two codefendants, Anthony A. Byrd and Cameron E. Jackson. Hayward entered a plea of not guilty.
>
> . . . On May 6, 2014, Hayward filed a motion to suppress any evidence obtained by police as a result of his detention, arguing law enforcement officers conducted an unconstitutional warrantless search. The state filed a memorandum contra Hayward's motion to suppress, and the trial court set the matter for hearing.
>
> . . . At a suppression hearing on June 8 and 9, 2015, Officer Stephen Carr of the Columbus Division of Police testified that around 3:15 a.m. on April 14, 2014 he responded to a dispatch of a possible theft in progress at a commercial trucking terminal located at 1929 Lone Eagle Street. Officer Carr testified the information he had upon arriving at the scene was that a truck driver at the trucking terminal saw several men removing cargo from a detached trailer and placing the cargo into two rental trucks. Before Officer Carr arrived, an unmarked cruiser entered the trucking terminal and observed the rental vehicles but did not observe any people. Officer Carr then arrived on the scene in a marked cruiser and he said a man named David Cline flagged him down and identified himself as the person who called 911 to report the possible theft and that Cline told him it was very unusual for anyone to be unloading anything at that time of day. Cline said he saw three men moving cargo from a trailer into two Penske rental trucks.
>
> . . . When he found the trailer and the two rental vehicles, Officer Carr said he observed Hayward, Byrd, and Jackson "casually just standing there," and when the officers told the men they were there to investigate a possible theft, the three men denied there was anything of that nature going on . . . . Officer Carr said Hayward did most of the talking. Hayward told the officers the men had been "contracted" to unload the trailer, but when officers asked them who owned the trailer, the men

2

could not name the owner . . . . Officer Carr further testified there were very large crates of watermelons sitting in the grassy area behind the trailer but when he asked the men what they were doing with the produce, the men gave a vague response about unloading the produce into the grass and possibly putting it on the loading dock later.

. . . Officer Carr testified that the men told him that a man who worked security for the trucking terminal, "a guy named Bob," knew they were there and that "it was completely okay for them to be there." . . . . Officer Carr then went to a mobile home parked at the entrance of the trucking terminal, and the occupant of that mobile home put Officer Carr in touch with the person who runs the trucking terminal. Approximately one–half hour later, the manager of the trucking terminal, whom Officer Carr identified as Mr. Seymour, arrived at the scene.

. . . In the time it took for Seymour to arrive at the scene, Officer Carr said he and the other officers "kind of stood around" with Hayward, Byrd, and Jackson and engaged in "very casual conversation," noting that the three men "didn't seem very concerned about [police] being there." . . . . Officer Carr said the three men provided police with their identification cards. Additionally, Officer Carr said Hayward spent some time on the phone trying to get in contact with the person Hayward said had contracted the men to unload the truck. Officer Carr said the three men would have been free to leave during this approximately 30–minute period while everyone waited for Seymour to arrive "[i]f they wished to." . . . .

. . . Once Seymour arrived at the trucking terminal, the police officers allowed Seymour to talk to Hayward, Byrd, and Jackson to discern whether the three men had leased a space on the lot or were working for someone who had leased a space. After a brief conversation, Seymour went to look at some paperwork in his office and then told police the three men "did not know anything about the owner of the trailer." . . . . Officer Carr said Seymour also told him that it was unusual to unload crates into wet grass.

. . . Officer Carr testified that there were two Penske rental vehicles parked near the trailer, a box truck with no windows, and a cargo van. The officers asked Hayward, Byrd, and Jackson about the rental vehicles several times and whether they were loading cargo into those vehicles "and each time the answer was, no, they had nothing to do with the rental trucks." . . . . Officer Carr testified that "with the totality of everything that was in front of me unable to identify the owner of the trailer, unable—this security person was not existing and the person that ran the dock saying that this simply did not look right to him," he and the other officers "believed there was an indeed a distinct possibility a theft was occurring." . . . . At that point, Officer Carr said he opened the back of the box truck "expecting to find crates of watermelons," but instead "found very large plastic wrapped packages that were numbered like they were in an exact sequence," and Officer Carr recognized the packages immediately as the typical packaging of narcotics . . . . Officer Carr said the packages "were wrapped very well," and that even though he was "pretty

3

sure at that point they were marijuana," he "couldn't even smell" anything from the packages . . . . Officer Carr reiterated that he opened the box truck at that point because "based on everything we had, we believed that the cargo was indeed being stolen" and that the three men were putting something into the rental vehicles . . . .

. . . After opening the box truck, the police officers detained Hayward, Byrd, and Jackson and placed each of them in a separate police cruiser. Officer Carr said he had a discussion with the other officers after the fact that if Hayward, Byrd, and Jackson had simply gotten in a car and drove away before officers opened the box truck, the officers would not have been able to stop them. Officer Carr testified that "[u]p to that point [when officers actually detained the three men, the officers] did not feel the need to detain anybody." . . . .

. . . After he looked in the box truck and detained Hayward, Byrd, and Jackson, Officer Carr testified he walked to the front of the rental van and, using his flashlight, looked in the windshield and "saw similar looking bundles in the back of the van that matched what [he] saw in the back of the box truck." . . . . The cargo van did not have any windows on the rear side, but Officer Carr testified you could see to the back of the vehicle by looking through the windshield. A short time later, the K–9 unit arrived, and the K–9 "[i]mmediately alerted" on the rental vehicles . . . . Eventually, the narcotics detectives came to the scene and "drew up a search warrant," at which point Officer Carr was relieved of his duties . . . . Jackson had been seated in the back of Officer Carr's cruiser but police moved him to a different cruiser so that Officer Carr could leave the scene. While he was driving to the substation, however, Officer Carr said he heard something fall in the back seat and he pulled over, finding a key for a Penske vehicle.

. . . On cross–examination, Officer Carr said he did not believe there was an immediate risk that any potential evidence inside the box truck would be destroyed or moved away because he "didn't know it was evidence until [he] looked in" the box truck . . . . Officer Carr also agreed that he wrote in his report of the incident that he had a "reasonable suspicion to believe that cargo was being stolen" at the time he opened the box truck . . . . Officer Carr further stated there was no smell of marijuana in the trucking terminal. Additionally, Officer Carr estimated that from the time he first arrived on the scene to when he opened the box truck, more than one hour had elapsed.

. . . Officer Joshua Kinzel of the Columbus Division of Police testified that when he arrived at the trucking terminal, he saw approximately 100 watermelons lying all over the ground by the detached trailer. Officer Kinzel said that when officers asked the three men questions, it was Hayward who gave "actual answers" and that Byrd and Jackson "kind of followed suit with whatever [Hayward] said" by nodding their heads . . . . Officer Kinzel said the three men were free to leave up until the point when the officers found the marijuana in the back of the box truck. When Officer Kinzel asked the men about the rental vehicles, he said that Hayward told him "they don't know anything about the trucks," and that none of the three

4

men indicated that the rental vehicles belonged to them . . . . Officer Kinzel could not recall whether Byrd or Jackson ever gave a verbal response denying any connection to the rental trucks. Officer Kinzel testified that he, along with Officer Carr, made the collective decision to open the box truck together. However, Officer Kinzel testified his primary reason for opening the box truck was for officer safety, though he agreed that approximately one and one–half hour passed from the time he first arrived to the time the officers opened the box truck. Officer Kinzel testified that one of the other officers, Officer Tonya Allen, heard a rolling overhead door shut as soon as the officers arrived on the scene, and because of that, the officers "didn't know if there was somebody else in the truck." . . . .

. . . Byrd testified that his friend, Shaunika Eakins, rented the box truck and cargo van in her name but that Byrd paid for the rental of the vehicles. He said it was his understanding that even though his name was not on the rental agreement, he controlled the rental vehicles. Further, Byrd said he never denied affiliation with the rental vehicles to police.

. . . After the suppression hearing, on July 6, 2015, the trial court denied Hayward's motion to suppress. The trial court stated its decision relied upon Officer Carr's testimony, which the trial court "found to be the most credible." . . . . Specifically, in denying Hayward's motion to suppress, the trial court stated:

> Detective Carr also stated that on cross–examination from Mr. Byrd's attorney, that what constituted criminal activity, he thought, was the 9–1–1 call, no legitimate explanation for being there, and the conversation with Mr. Seymour that things didn't look right. He also based his reasonable suspicions on cross from Mr. Hayward's attorney stating that he was unable to—the defendants were unable to ID the trailer owner, that there was no security person named Bob that they said it was okay for them being there, and that Mr. Seymour also said things did not look right. Further, he based his reasonable suspicions on Mr. Jackson's attorney, on Mr. Cline stating that there was unusual activity for that time of day and that Mr. Seymour said something was not right and was unusual. Therefore, there was reasonable suspicion to look in the box truck and the van.

. . . . The trial court further stated that after the officers looked in the box truck and van, there was probable cause to arrest Hayward, Byrd, and Jackson.

. . . The matter then proceeded to a joint jury trial for all three defendants beginning October 5, 2015. The evidence at trial largely duplicated the evidence presented at the suppression hearing, though additional witnesses testified at trial . . . .

. . . At the conclusion of the trial, the jury returned verdicts against Hayward, Byrd, and Jackson, finding them guilty of possession of marijuana and trafficking in marijuana. After a November 4, 2015 sentencing hearing, the trial court sentenced

5

Hayward to 8 years' imprisonment and imposed a 12–month driver's license suspension and a $7,500 fine. The trial court journalized Hayward's convictions and sentence in a November 4, 2015 judgment entry.

. . . Hayward appealed, arguing that the trial court erred in denying the motion to suppress. This court agreed with Hayward, concluding the trial court erred in applying the reasonable suspicion standard to the search of the box truck and that the trial court should have determined whether there was probable cause to search the box truck under the automobile exception to the warrant requirement. *State v. Hayward*, 10th Dist. No. 15AP–1097, 2016–Ohio–7671, ¶ 25–27 (*"Hayward I"*). We remanded the case for the trial court to "make the appropriate factual findings relevant to a probable cause analysis for the search of the box truck and then determine, in the first instance, whether officers had probable cause to search the box truck." *Id.* at ¶ 27.

. . . On remand, the trial court once again denied Hayward's motion to suppress. The trial court issued a written order and entry on March 30, 2017 concluding "[t]he totality of the circumstances leading up to the opening of the box truck gave the officers ample probable cause to believe that the box truck would contain contraband and search the box truck under the automobile exception." (Order & Entry at 6.) In denying Hayward's motion to suppress, the trial court additionally concluded the officers had probable cause for their subsequent search of the cargo van.

. . . Subsequently, on May 1, 2017, the trial court issued an amended judgment entry noting it had overruled Hayward's motion to suppress on remand and reinstating Hayward's original judgment of conviction entered November 4, 2015. Hayward timely appeals.

II. Assignments of Error

. . . Hayward assigns the following errors for our review:

[1.] The trial court erred when it denied Ronald Hayward's Motion to Suppress in violation of the Fourth Amendment to the U.S. Constitution, and Article I, Sec. 14 of the Ohio Constitution.

[2.] The trial court violated Ronald Hayward's rights to due process and a fair trial when it entered a conviction against Mr. Hayward for Trafficking in Drugs, in the absence of sufficient evidence. Fifth and Fourteenth Amendments to the United States Constitution and Section 16, Article I of the Ohio Constitution.

[3.] The trial court violated Ronald Hayward's rights to due process and a fair trial when it entered a judgment of conviction for Trafficking in Drugs, when that judgment was against the manifest weight of the evidence. Fifth and Fourteenth

Amendments to the United States Constitution and Section 16, Article I of the Ohio Constitution.

*State v. Hayward*, No. 17AP–390, 2018 WL 1448734, at *1–5, (Ohio Ct. App. March 23, 2018). On March 23, 2018, the state court of appeals overruled those three assignments of error and affirmed the trial court's judgment. *Id*. at *9.

On January 9, 2019, Petitioner executed and placed in the prison mail system a petition for federal habeas relief ("the first habeas petition") which was docketed in this Court under *Hayward v. Warden, Grafton Corr. Inst.*, 2:19–cv–00224. The on–line docket for the Ohio Supreme Court indicates that after filing the first habeas petition, Petitioner filed a motion seeking leave to file a delayed direct appeal in the Ohio Supreme Court. *State of Ohio v. Hayward*, No. 19–109, Ohio Supreme Court Docket January 25, 2019. While the motion for a delayed direct appeal was pending, this Court denied the first habeas petition without prejudice for failure to exhaust. *Hayward v. Warden, Grafton Corr. Inst.*, 2:19–cv–00224, Doc. No. 5. On March 20, 2019, the Ohio Supreme Court summarily denied Petitioner's motion for a delayed direct appeal. *State of Ohio v. Hayward*, No. 19–109, Ohio Supreme Court Docket March 20, 2019.

Petitioner placed the *instant* petition ("the second habeas petition") in the prison mail system on March 20, 2019. (Doc. No. 1, at PAGE ID # 15.) In it, Petitioner alleges the same claims that he alleged in the first habeas petition— he again asserts that the search of the box truck violated his Fourth Amendment rights (Ground One); that the drug trafficking verdict was not supported by sufficient evidence (Ground Two); and that the possession and trafficking verdicts were against the manifest weight of the evidence (Ground Three). (*Id*., at PAGE ID ## 5, 7, 8.)

II.     **The Second Habeas Petition is Not Successive**

As a preliminary matter, the Magistrate Judge concludes that Petitioner does not need permission from the Sixth Circuit Court of Appeals to proceed with the second habeas petition.

7

The Antiterrorism and Effective Death Penalty Act of 1996 (Pub. L. No 104-132, 110 Stat. 1214) (the "AEDPA") enacted a ban on successive habeas corpus petitions unless a circuit court of appeals grants a petitioner permission to proceed. 28 U.S.C. § 2244(b). Nevertheless, not every second–in–time or later habeas application is successive such that a petitioner must first obtain permission from a circuit court before proceeding in a district court. *In re Wogenstahl*, 902 F.3d 621, 626–27 (6th Cir. Sept. 4, 2018) (citing *In re Coley*, 871 F.3d 455, 457 (6th Cir. 2017) (citing *Panetti v. Quarterman*, 551 U.S. 930, 944 (2017)). The second habeas petition alleges the same ground for relief and challenges the same conviction as the first habeas petition. A petition is not, however, successive within the meaning of § 2244(b) when a state prisoner's first petition is dismissed for failure to exhaust state remedies. *Slack v. McDaniel*, 529 U.S. 473, 487 (2000). Such are the circumstances here.

### III.  Petitioner's Claims Are Procedurally Defaulted

Although the second habeas petition is not successive, the Magistrate Judge finds that all three of Petitioner's grounds for relief are procedurally defaulted because Petitioner failed to file a timely direct appeal in the Ohio Supreme Court.

Congress has provided that state prisoners who are in custody in violation of the Constitution or laws or treaties of the United States may apply to the federal courts for a writ of habeas corpus. 28 U.S.C. § 2254(a). In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state criminal defendant with federal constitutional claims is required to present those claims to the state courts for consideration. 28 U.S.C. § 2254(b), (c). If he fails to do so, but still has an avenue open to present his claims, his petition is subject to dismissal for failure to exhaust state remedies. *Id.; Anderson v. Harless,* 459 U.S. 4, 6, 8 (1982) (*per curiam*) (citing *Picard v. Connor,* 404 U.S. 270, 275–78 (1971)). In addition to refusing to

entertain unexhausted claims, federal courts will not consider the merits of procedurally defaulted claims unless a petitioner demonstrates cause for the default and resulting prejudice, or where failure to review the claim would result in a fundamental miscarriage of justice because a constitutional violation probably resulted in the conviction of someone who is actually innocent of the substantive offense. *Lundgren v. Mitchell*, 440 F. 3d 754, 763 (6th Cir. 2006) (citing *Coleman v. Thompson*, 501 U.S. 722, 749 (1991)); *Dretke v. Haley,* 541 U.S. 386, 392 (2004) (citing *Murray v. Carrier*, 477 U.S. 478, 496 (1986)).

"A claim may be procedurally defaulted in two ways." *Lovins v. Parker*, 712 F.3d 283, 295 (6th Cir. 2013) (quoting *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006)). First, a claim will be procedurally defaulted where a petitioner fails to raise and pursue a claim through the state's "ordinary appellate review procedures." *Thompson v. Bell*, 580 F.3d 423, 437 (6th Cir. 2009) (citing *Williams*, 460 F. 3d 806) (quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 846–47 (1999)). Thus, a petitioner must "'obtain consideration of a claim by a state courts . . . while state–court remedies are still available.'" *Lundgren*, 440 F. 3d at 763 (quoting *Seymour v. Walker*, 224 F.3d 542, 549–50 (6th Cir. 2000) (citing *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977)). If, at the time the petition is filed, state law no longer allows the petitioner to raise the claim, it is procedurally defaulted. *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982); *see also Coleman*, 501 U.S. at 735 n.1 (1991); *Lovins*, 712 F.3d at 295 ("a claim is procedurally defaulted where the petitioner failed to exhaust state–court remedies, and the remedies are no longer available at the time the federal habeas petition is filed because of a state procedural rule.")

Second, a claim may be procedurally defaulted if state–court remedies have been exhausted but the last reasoned state–court judgement declines to reach the merits of the claim because of a petitioner's failure to comply with a state procedural rule. *Lovins*, 712 F.3d at 295; *Lundgren*, 440

9

F. 3d at 763. In such circumstances, courts in the Sixth Circuit engage in a four–part analysis described in *Maupin v. Smith* 785 F.2d 135, 138 (6th Cir. 1986). The court must first determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule. Second, the court must determine whether the state courts actually enforced that state procedural rule. Third, the court must determine whether the forfeiture is an adequate and independent state ground upon which the state can rely to foreclose review of a federal constitutional claim. *Maupin*, 785 F.2d at 138. Finally, if "the court determines that a state procedural rule was not complied with and that the rule [was] an adequate and independent state ground, then the petitioner" may still obtain review of his or her claims on the merits if the petitioner establishes: (1) cause sufficient to excuse the default and (2) that he was actually prejudiced by the alleged constitutional error. *Id.*

In this case, the state appellate court affirmed the state trial court on March 23, 2018. Petitioner had forty–five days after that judgment was entered to seek a timely direct appeal in the Ohio Supreme Court. *See* S.Ct.Prac. R. 7.01(A)(1). He did not do so. Instead, on January 25, 2019, he filed a motion for leave to file a delayed direct appeal in the Ohio Supreme Court. That motion for delayed appeal was, however, summarily denied.

In these circumstances, Petitioner's claims are procedurally barred in the second manner descried above. In *Bonilla v. Hurley*, the Sixth Circuit Court of Appeals held that the Ohio Supreme Court's summary denial of a motion for a delayed appeal constitutes a procedural ruling. 370 F.3d 494, 497 (6th Cir. 2004). The Sixth Circuit reached that conclusion because a defendant who seeks a delayed appeal in the Ohio Supreme Court is required to present adequate reasons for filing an appeal after the forty–five day deadline, but he is not required to present the claims and arguments that he intends to assert in a delayed appeal if one is allowed. *Id.* In addition, the Sixth

Circuit explained that when, as is the case here, the Ohio Supreme Court "is entirely silent as to its reasons for denying requested relief, [federal courts] assume that the state court would have enforced any applicable procedural bar." *Id*. Moreover, the Sixth Circuit further explained that the Ohio Supreme Court's summary dismissal of a "motion for a leave to file a delayed appeal constitutes a procedural ruling sufficient to bar federal court review" of a habeas corpus petition. *Id*. In light of this controlling authority, the Magistrate Judge concludes that there was an applicable procedural rule—the forty–five day deadline to file a direct appeal— that the Ohio Supreme Court enforced against Petitioner when it denied his motion for a delayed appeal, and that the rule constituted an independent and adequate state ground upon which the state could rely to foreclose review of Petitioner's claims.

The Magistrate Judge further concludes that Petitioner makes no allegations that might excuse this procedural default. "'[C]ause' under the cause and prejudice test must be something external to the petitioner, something that cannot fairly be attributed to him[,] '. . . some objective factor external to the defense [that] impeded . . . efforts to comply with the State's procedural rule.'" *Coleman*, 501 U.S. at 753 (quoting *Murray*, 477 U.S. at 488). It is Petitioner's burden to show cause and prejudice. *Hinkle v. Randle*, 271 F.3d 239, 245 (6th Cir. 2001) (citing *Lucas v. O'Dea*, 179 F.3d 412, 418 (6th Cir. 1999) (internal citation omitted)). A petitioner's *pro se* status, ignorance of the law, or ignorance of procedural requirements are insufficient bases to excuse a procedural default. *Bonilla*, 370 F.3d at 498. Instead, to establish cause, a petitioner "must present a substantial reason that is external to himself and cannot be fairly attributed to him." *Hartman v. Bagley*, 492 F.3d 347, 358 (6th Cir. 2007).

Petitioner does not explain why he failed to file a timely direct appeal in the Ohio Supreme Court. Instead, he alleges only that he failed to present Grounds One and Three in a post–

conviction motion or petition for habeas corpus in the state trial courts because of his counsel's failures. Petitioner states that his "hired attorney never did file any post–conviction petition on his client's behalf, nor did the attorney explain to Petitioner about any post–conviction for relief," and that his "attorney never informed Petitioner about any post–conviction motion Petitioner was entitled to, nor did the attorney filed [*sic*] any post–conviction petition on Petitioner's behalf." (Doc. No. 1, at PAGE ID # 6.) These allegations do not, however, suffice. The Sixth Circuit has held that appellate counsel has an obligation to advise an Ohio defendant about the deadline for filing for post-conviction relief under Ohio Rev. Code § 2953.21, and that failure to do so can constitute cause to excuse the failure to file a timely post–conviction petition. *Gunner v. Welch*, 749 F.3d 511, 515 (6th Cir. 2014). Nevertheless, all of Petitioner's claims appear on the face of the record. Under Ohio law, they therefore were required to be raised in a direct appeal, not in a post–conviction petition under § 2953.21. *State v. Cole*, 2 Ohio St. 3d 112, 113 (Ohio 1982) (citing *State v. Perry*, 10 Ohio St. 2d 175 (Ohio 1967)). Whatever Petitioner's counsel may or may not have told him about the deadline for seeking post–conviction relief has no bearing on his failure to file a direct appeal in the Ohio Supreme Court.

For these reasons, the Magistrate Judge concludes that all of Petitioner's claims are procedurally barred.

## III. Grounds One and Three are Not Cognizable

Even if the grounds were not procedurally barred, two of them cannot proceed because they are not cognizable. First, Petitioner's Fourth Amendment claim (Ground One) is not cognizable because federal habeas corpus relief is not available for an alleged violation of the Fourth Amendment so long as the state provides a petitioner with a "full and fair opportunity to litigate his Fourth Amendment claim in state court." *Henderson v. Wainwright,* Case No. No. 17–

12

3948, 2018 WL, at *3 (6th Cir. Feb 26, 2018) (citing *Stone v. Powell*, 428 U.S. 465, 482 (1976)). In *Good v. Berghuis*, 729 F. 3d 636, 638–40 (6th Cir. 2013), the Sixth Circuit Court of Appeals explained that "[t]he 'opportunity for full and fair consideration' means an available avenue for the prisoner to present his [or her] claim to the state courts, not an inquiry into the adequacy of the procedure actually used to resolve that particular claim." *Id*. at 639. The Sixth Circuit also explained that "[I]n the absence of a sham proceeding, there is no need to ask whether the state court conducted an evidentiary hearing or to inquire otherwise into the rigor of the state judiciary's procedures for resolving the claim." *Id.*

Here, Petitioner was able to present his Fourth Amendment claims to the trial court in his motion to suppress. Petitioner was later able to present his Fourth Amendment claims to the Ohio appellate court. The Ohio Court of Appeals fully considered that claim and then remanded it to the trial court so that it could apply the proper standard– probable cause instead of reasonable suspicion. The Ohio Court of Appeals then considered and affirmed the probable cause determination that the trial court made on remand. This is sufficient to preclude habeas review even if Petitioner alleges that the state courts reached the wrong result on the suppression determination. *Hillman v. Beightler,* Case No. 5:09–CV–2538, 2010 WL 2232635, at *5 (N.D. Ohio May 26, 2010) (citing *Cabrera v. Hinsley*, 324 F.3d 527, 531– 32 (7th Cir. 2003) (explaining that a full and fair opportunity to litigate guarantees the right to present a case, but it does not guarantee a correct result).

In addition, Petitioner's manifest weight claim (Ground Three) does provide a basis for federal habeas relief. *See Williams v. Jenkins*, No. 1:15cv00567, 2016 WL 2583803, at *7 (N.D. Ohio Feb. 22, 2016) (citing *Nash v. Eberlin*, 258 Fed. App'x. 761, 765, n.4 (6th Cir. 2007)); *Norton v. Sloan*, No. 1:16–cv–854, 2016 WL 525561, at *5 (N.D. Ohio Feb. 9, 2017) (citing *Ross v.*

*Pineda*, No. 3:10–cv–391, 2011 WL 1337102, at *3 (S.D. Ohio)) ("Whether a conviction is against the manifest weight of the evidence is purely a question of Ohio law."); *see also Taylor v. Warden, Lebanon Correctional Inst.*, 2017 WL 1163858, at *10–11 (S.D. Ohio March 29, 2017) (same) (citations omitted). Under Ohio law, a claim that a verdict was against the manifest weight of the evidence—as opposed to one based upon insufficient evidence—requires the appellate court to act as a "thirteenth juror" and review the entire record, weigh the evidence, and consider the credibility of witnesses to determine whether "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin*, 20 Ohio App.3d 172, 175 (1983); *cf. Tibbs v. Florida*, 457 U.S. 31 (1982). Because a federal habeas court does not function as an additional state appellate court, vested with the authority to conduct such an exhaustive review, Petitioner's claim that his convictions were against the manifest weight of the evidence is not cognizable in a federal habeas action.

Therefore, the Magistrate Judge concludes that Petitioner's fourth amendment (Ground One) and manifest weight (Ground Three) could not proceed even if they were not procedurally barred.

**IV.     Recommended Disposition**

For these reasons, the Magistrate Judge **RECOMMENDS** that the petition be **DENIED** and that this action be **DISMISSED**.

**PROCEDURE ON OBJECTIONS**

If any party objects to this *Report and Recommendation* ("R&R"), that party may, within fourteen days of the date of this R&R, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a *de novo*

determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. 636(B)(1).

The parties are specifically advised that failure to object to this R&R will result in a waiver of the right to have the District Judge review the R&R *de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the R&R. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

The Clerk is **DIRECTED** to serve a copy of the petition and all subsequent filings on Respondent and the Attorney General of Ohio, Habeas Corpus Unit of the Corrections Litigation Section c/o: Brian.Higgins@ohioattorneygeneral.gov and Habeas.docketclerk@ohioattorneygeneral.gov.

**IT IS SO ORDERED**.

Date: May 9, 2019                                  /s/ Kimberly A. Jolson
                                                   KIMBERLY A. JOLSON
                                                   UNITED STATES MAGISTRATE JUDGE